# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

No. 09 Civ. 5644 (RJS)

PENSIOENFONDS METAAL EN TECHNIEK,
F/K/A STICHTING BEDRIJFSPENSIOENFONDS VOOR DE
METAAL EN TECHNISCHE BEDRIJFSTAKKEN

Plaintiff,

VERSUS

STRATEGIC DSRG, LLC,

Defendant.

OPINION AFTER BENCH TRIAL
February 3, 2012

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2-3-12

RICHARD J. SULLIVAN, District Judge:

Plaintiff Pensioenfonds Metaal en Techniek ("PMT") brings this diversity action for breach of contract against Defendant Strategic DSRG, LLC, in connection with the parties' involvement in a real estate investment trust known as the Donahue Schriber Realty Group ("DSRG" or the "Company"). This action arises out of Plaintiff's exercise of a put option that permitted Plaintiff, upon the occurrence of certain conditions, to sell its shares of DSRG to Defendant at a price equal to 95% of the Company's net asset value ("NAV"). Following the Court's denial of the parties' cross-motions for summary judgment, this case proceeded to a bench trial, which the Court conducted over three days in late October and early November 2011. The sole issue at trial was whether the methodology used by DSRG's board of directors in setting the Company's NAV as of September 30, 2008, "reflect[ed] the actual value of the Company," as was required by the terms of the put agreement. For the reasons that follow, the Court finds that the NAV arrived at by the board sufficiently reflected DSRG's actual value to satisfy the terms of the parties' agreement.

I. BACKGROUND

A. Facts[1]

DSRG is a real estate investment trust that, as of December 2008, owned 86 properties, most of which were shopping centers located in California, Arizona, Nevada, and Oregon. (Stip. ¶ 1.) Plaintiff, a Dutch pension fund, became an investor in DSRG in 1999. (*Id.* ¶¶ 3-4.) Defendant, a limited liability company, purchased shares of DSRG in 2002. (*Id.* ¶ 6.) After Defendant's purchase of DSRG shares, Defendant and the New York State Teachers' Retirement System ("NYSTRS") were the two largest investors in DSRG, each holding approximately 38% of the Company's stock. (*Id.* ¶ 12.) Plaintiff, the next largest investor, owned approximately 14% of DSRG's shares. (*Id.*) At all times relevant to this action, J.P. Morgan Investment Management Inc. ("JPMorgan") managed the investments of Defendant and the NYSTRS. (*Id.* ¶ 7.)

On December 30, 2002, the parties executed a put agreement (the "Put Agreement"), which provided that, upon the occurrence of certain conditions, Plaintiff could require Defendant to purchase its DSRG shares at a price equal to 95% of the NAV "as determined at the end of the calendar quarter immediately preceding the quarter in which the Exercise Notice . . . is delivered." (PX-1 § 2.1.) Section 1.2 of the Put Agreement defines NAV as

> the value of Securities based on the net asset value of the Company as determined in good faith and in a manner consistent with the fiduciary duties of the Board of Directors to the Company's stockholders, and as reported to the Company's stockholders, on an annual basis (and as such net asset value is updated quarterly) according to the valuation methodology employed by the Company's Board of Directors (which methodology will reflect the actual value of the Company).

(*Id.* § 1.2.)

Between 2003 and 2008, DSRG commissioned an annual appraisal to determine the Company's year-end value. (*See* Decl. of Sheryl Crosland, dated Sept. 30, 2011 ("Crosland Decl.") ¶ 9.) Pursuant to that process, an independent appraiser conducted a detailed evaluation of each of DSRG's properties to determine its net asset value. (*See id.* ¶¶ 14, 16; DX-23, DX-24.) Because such a detailed appraisal was costly and time consuming, it was only undertaken once per year. (*See* Tr. 126:3-7, 415:25-416:6.) Since 2005, New Market Real Estate Group ("New Market") performed that appraisal. (Crosland Decl. ¶ 15.)

In addition to the yearly appraisal, DSRG's board of directors (the "Board") met quarterly to update the Company's NAV and share price. (*Id.* ¶ 17.) Unlike the yearly appraisals, which utilized property-specific data such as capitalization rates[2] and net operating income ("NOI") from New Market's appraisal, the Board's quarterly updates were based on bookkeeping

---

[1] The following facts are taken from the evidence presented at trial, the trial transcript ("Tr."), the parties' stipulated facts ("Stip."), and the joint pre-trial order ("PTO").

[2] A capitalization rate, or "cap rate," is a figure that represents the expected rate of return on an asset. Because the market value of an asset is equal to the asset's net operating income divided by its cap rate, the market value of an asset decreases as the asset's cap rate increases. (*See* Tr. 10:15-11:8.)

adjustments reflecting cash transactions, acquisition or disposition of property, and the marking of debt to market. (*Id.*; Tr. 127:3-128:11, 221:6-222:2, 223:14-20.) While the Board had the ability to make additional adjustments for "material developments," there is no evidence that DSRG ever made quarterly adjustments to market-level variables like cap rates and NOI. (*See* PX-11.) Consequently, the changes to valuation that occurred following the year-end appraisal were typically greater than the quarterly adjustments. (*See* Decl. of John Taylor, dated Sept. 30, 2011 ("Taylor Decl."), Ex. B.)

On November 11 and 12, 2008, in the midst of a burgeoning economic crisis, the Board met to update DSRG's NAV for the quarter ending September 30, 2008. At the meeting, the Board discussed whether to downwardly adjust the Company's NAV from the December 31, 2007 value that, pursuant to New Market's year-end appraisal, was calculated at $42.51 per share. (*See* DX-12A.) Specifically, the Board discussed the prospect of rising cap rates and the resulting risk that the Company faced of violating its loan covenants. (Tr. 93:23-94:9.) Benjamin Gifford, JPMorgan's representative on the Board, informed members of the Board that Strategic had written down the value of its investment in DSRG as of September 30, 2008, "due to the current turbulence in the marketplace."[3] (Stip. ¶ 19.) Following its typical procedure, the Board marked the Company's current debt to market but it did not update other property-specific data such as cap rates and NOI from the values determined by New Market's December 31, 2007 appraisal.

(*See* DX-12A, DX-12B; Tr. 127:3-128:11, 492:18-493:16.) Ultimately, the Board set the September 30, 2008 NAV at $42.11 per share. (DX-12B; DX-13.) The parties agree that the Board acted in good faith and in a manner consistent with their fiduciary duties when updating the NAV. (Stip. ¶ 18.)

On December 22, 2008, Plaintiff notified Defendant that it was exercising its option under the Put Agreement, which it had begun to consider doing at the end of November 2008. (Stip. ¶¶ 20-21.) Gifford testified that he was "shocked" at Plaintiff's decision to exercise the put option, and that he felt "a little bit abused and disrespected," but the Board nevertheless decided to honor the put. (Tr. 440:15-18.) Defendant then directed New Market to conduct a full appraisal, equivalent to the year-end appraisal conducted annually, of DSRG as of September 30, 2008. New Market did so and determined that the NAV per-share of DSRG as of September 2008 was $36.60. (DX-25; Tr. 445:24-446:25.)

By June 19, 2009, Plaintiff was ready to close on the put and demanded that Defendant pay it $141,608,849.20. (*See* Mem. and Order dated Jan. 24, 2011, Doc. No. 70 at 3.) This amount reflected 95% of DSRG's NAV, set at $42.11 per share, for Plaintiff's 3,539,823 shares of DSRG Class G common stock. (*Id.*) Defendant, by contrast, offered to pay Plaintiff only $123,079,645.71, a price equivalent to 95% of DSRG's NAV, set at $36.60 per share, for Plaintiff's Class G common stock. (*Id.* at 3-4)

On September 10, 2009, Plaintiff transferred all of its DSRG Class G common stock to Defendant in exchange for $123,079,645.17, but reserved its right to pursue the remaining $18,529,203.49. (*Id* at 4.)

---

[3] While Gifford informed the Board that Strategic had written down the value of DSRG, Gifford's testimony at trial suggests that he did not apprise the Board of the amount of the writedown, which adjusted DSRG's value to approximately $38 per share. (*See* Tr. 457:21-461:19; DX-19.)

B. Procedural History

Plaintiff commenced this action on June 19, 2009, seeking to recover the $18,529,203.49 it claims it is owed, plus interest. On May 14, 2010, the parties filed cross-motions for summary judgment, which were fully submitted on June 4, 2010. On January 24, 2011, the Court issued an opinion denying both parties' motions, but ruling as a matter of law that "the Put Agreement obligates the DSRG Board to calculate NAV according to a methodology that reflects the 'actual value' of DSRG," and not merely one agreed upon by the Board in good faith and consistent with its fiduciary duties. *Pensioenfonds Metaal en Techniek v. Strategic DSRG, LLC*, No. 09 Civ. 5644 (RJS), 2011 WL 310327, at *6 (S.D.N.Y. Jan. 24, 2011). Nevertheless, the Court stressed that "that there is likely a range of methodologies that would reasonably reflect actual value." *Id.*

Following the summary judgment ruling, the Court ordered that the trial be bifurcated into two phases. The first phase of trial would address solely whether the methodology used by the Board in setting the September 30, 2008 NAV reflected the actual value of DSRG. If the Court found that the methodology did not reflect DSRG's actual value, then the trial would proceed to the second phase, in which the Court would determine DSRG's NAV as of September 30, 2008. Following pretrial discovery, the Court conducted the first phase of the trial between October 25 and November 3, 2011. The parties filed post-trial briefs, which were fully submitted as of December 15, 2011.

III. DISCUSSION

A. The Board's Methodology

As noted above, the lone issue before the Court during this phase of the trial is whether the methodology employed by the Board in setting the September 30, 2008 NAV at $42.11 per share reflected the actual value of DSRG, as required under the Put Agreement. Defendant argues that the methodology used by the Board did not reflect DSRG's actual value because it relied on stale data that did not properly account for changes to cap rates and NOI caused by the economic crisis of 2008. According to Defendant, the NAV arrived at by the Board, when compared to the $36.60 per share value that was the result of New Market's appraisal, "understated the decline in the actual value of DSRG between December 31, 2007, and September 30, 2008, by at least twelve times the true magnitude of the decline." (Def.'s Mem. at 1.) The consequence of this understatement, Defendant asserts, was to allow Plaintiff to exploit an "arbitrage opportunity" that was inconsistent with the "spirit" of the Put Agreement. (Def.'s Mem. at 4.)

After careful consideration of the evidence presented at trial, the Court finds that the methodology employed by the Board in determining the September 30, 2008 NAV was sufficiently reflective of DSRG's actual value to satisfy the unscientific terms of the Put Agreement. As the Court noted in its summary judgment opinion,

a methodology reflecting "actual value" does not necessarily mean that the most precise or accurate methodology is required. The plain language of the Put Agreement requires merely that the methodology used must have "reflect[ed]" the actual

4

value of DSRG.  The Court recognizes that there is likely a range of methodologies that would reasonably reflect actual value.  So long as the board utilized one such methodology, the existence of a separate, more precisely calibrated alternative is immaterial.

*Pensioenfonds*, 2011 WL 301327, at *6. Accordingly, the fact that the methodology employed by New Market in its year-end appraisal may have been more comprehensive, and ultimately more accurate, does not, in and of itself, lead to the conclusion that the Board's methodology did not reflect the Company's actual value. As the Court pointed out several times during trial, the parties were free to negotiate a contract that required a full-blown appraisal and the specific criteria to be considered as part of the appraisal upon the exercise of the put option.  Significantly, the parties did not do so, and it is not for the Court to renegotiate the terms of the agreement nine years after the fact.

Defendant argues, however, that communications around the time of the November 2008 board meeting demonstrate that, in light of the turbulent global economy, the Board and DSRG's senior management were aware that cap rates were rising and that relying on 2007 year-end data would result in an NAV that was overstated. For example, Larry Casey, DSRG's chief operating officer, testified at his deposition that, around the time of the November 2008 board meeting, DSRG's management was "about ready to say, hey, all hell has broken loose with the increase of cap rates of 75 [basis points] that has been indicated." (Casey Dep. at 139:14-17.)  Defendant also points to two e-mails from Stephen Latimer, Plaintiff's representative on the DSRG board, in which Latimer expressed concerns about the possibility of DSRG violating its

loan covenants in light of the fact that a "50 basis point increase in cap rates seems well within the realm of possible results."  (DX-64, DX-66.)  Latimer further testified that, at the time of the November 2008 board meeting, he had a "guess opinion" that the NAV set by the Board was overstated.  (Tr. 201:9-20.)

While this evidence suggests that DSRG management and the Board were aware that the tumultuous economy posed a threat to the Company's value going forward, the evidence presented at trial demonstrates that, as of September 30, 2008, and through November 2008, there existed substantial uncertainty regarding the impact of the financial crisis on the real estate market generally and on DSRG in particular. Indeed, Latimer testified credibly that his concerns about rising cap rates were primarily directed at the quarter *following* September 30, 2008:  "[T]hat November e-mail was kind of really saying, jeez, what do we think the . . . December 30th appraisal is going to look like[?]" (Tr. 102:11-13.)  As Latimer further testified:

A. I think by November of 2008, generally . . . there [were] indications that there were issues happening in the economy that we need to be planning for our future in terms of how it would reflect on our company, yes.

\* \* \*

THE COURT: Do you think these were post-September 30th developments?

THE WITNESS: I think it's a continuum, so, you know, I think things became clear -- more clear post-September 30th, absolutely.

(Tr. 95:13-22.)  Moreover, Latimer testified that his "guess opinion" that the NAV was overstated was based on a "back-of-the-envelope quote" that was intended to provide a "big picture" with respect to "what may be occurring to the value of the company on a going forward basis."  (Tr. 92:23-93:2.)  As he explained,

> [a]s a board member I signed off on the 9/30 valuation as being reasonable and fair, so why would I have a different opinion at that point in time[?]  We were then like, OK, 9/30 is over, let's worry about 12/31, what's happening then.  We're looking forward.  We are not looking back.  The fact was done.  It was booked, in stone, everybody approved it here.

(Tr. 210:15-20.)[4]

The uncertainty surrounding the impact of the economy on DSRG's value is further evidenced by Latimer's testimony that, during the previous board meeting in August 2008, the Board was "cautiously optimistic," and continued making acquisitions and paying dividends.  (Tr. 84:12-17.)  By the November 2008 board meeting, this optimism had been tempered somewhat, but as the Board discussed the budget for 2009, they remained optimistic about the Company's expected results of operations and cash flow for the coming year.  (Tr. 100:14-23.)  Indeed, the 2009 Budget Proposal that was prepared in advance of the November 2008 meeting noted that there was an increase in NOI of 11%, a dividend of $1.45 per share was paid, and occupancy at the Company's properties as of September 30, 2008 was 95.56%.  (PX-22 at 1.)

To be sure, the data available to the Board was not entirely positive.  For instance, the budget proposal noted that "same store net operating income is projected to decline 2.08% over the prior year" due to "greater than normal attrition and the granting of rent relief."  (*Id.*)  Additionally, in the DSRG Executive Summary presented to the Board in advance of the November 2008 meeting, Pat Donahue, the chairman and CEO of DSRG, warned the Board that "the storm is here, the plywood is up, and our people are hard at accomplishing our objectives for 2008/2009 and beyond."  (PX-21 at STR-0000941.)  But such evidence, when viewed in the context of the entirety of information available to the Board at the time, is insufficient to establish that the NAV set by the Board was overstated.  Nor is it clear that such statements were made in reference to the third quarter as opposed to the more dire fourth quarter, which was reaching its midpoint at the time of the Board meeting.  In any event, as evidenced by the testimony and evidence cited above, the economic landscape was dominated by uncertainty.  Despite this uncertainty, however, the Board voted to approve the $42.11 NAV at a time when it knew that the Kaiser entities, a corporate investor in DSRG, would be redeeming its shares based on the September 30, 2008 NAV.  (Tr. 111:2-13.)  Indeed, Kaiser's shares were ultimately redeemed for approximately $7.2 million.  (*See id.*; PX-31.)

The Court's finding that the share price set by the Board sufficiently reflected the Company's actual value is further supported

---

[4] Any suggestion that Latimer was incentivized to overstate the NAV so that he could maximize the value of Plaintiff's put option is refuted by the parties' stipulation that Plaintiff did not begin exploring the possibility of exercising the option until late November 2008.  (Stip. ¶ 21.)  As noted above, the parties likewise stipulated that the Board's decision to set the September 30, 2008 NAV at $42.11 per share was done in good faith and in a manner consistent with the Board's fiduciary duties.  (Stip. ¶ 18.)

by the credible evidence that downward trends in the economy generally were being experienced differently across various industries. As a result, while the Lehman Brothers bankruptcy might have triggered panic in the financial sector, the precise effects of the economic downturn on the type of commercial real estate investments owned by DSRG remained much less certain. As Plaintiff's expert explained, while the "financial sector clearly went through a major upheaval," it "took a while to recognize and . . . fully understand" the effect the economic downturn would have on the real estate sector. (Tr. 234:6-22.) Moreover, DSRG's portfolio was considered more "recession resilient" than other similar commercial real estate investment trusts. (PX-19 at STR-0002310.) Testimony at trial established that DSRG was a "very well-organized company" with a "very specialized portfolio." (Tr. 258:18-259:2.) Not only did DSRG's portfolio consist primarily of "grocery-anchored" shopping centers, which are "considered more resistant to the impacts of . . . economic downturns" because they cater to customers' "daily shopping needs," but DSRG's properties were geographically diverse, which was "clearly helpful in being recession resistant." (Tr. 72:3-11, 73:8-10.) Thus, while the August 2008 Executive Summary acknowledged that DSRG's portfolio was not "bullet proof," the evidence at trial established that the Company was better positioned to endure a period of economic turbulence than were businesses in other industries.

Defendant asserts, nevertheless, that the testimony at trial established that the Board knew that the September 30, 2008 NAV was overstated but believed it was appropriate to follow the protocol that had been in place for determining quarterly updates. As noted above, Latimer testified that he had a "guess opinion" that the NAV may have been "modestly overstated"; however, his subsequent testimony indicates that the amount of the overstatement based on increasing cap rates was marginal at best:

> So on that basis that is one data point. And, you know, chatter in the marketplace and all the other things you do when you are in the industry, would lead you to believe that versus 12/31/07, 9/30/08 values were less. How much less? I don't know. I don't have that level of detail. But were they less? Yes. If you look at [industry] data it will tell you something like 2 percent less, which in real estate valuation is a rounding error.

(Tr. 207:6-12.)

Benjamin Gifford, one of JPMorgan's representatives on the DSRG Board, also testified that at the time he voted for the $42.11 NAV, he believed that the number overstated the value of the assets of the Company. (Tr. 485:19-22.) However, prior to offering that testimony, Gifford equivocated considerably when asked if he believed the September 30, 2008 NAV was overstated:

> THE COURT: You thought it was okay to approve an NAV that you believed to be overstated because an appraisal was going to be done at a later date?
>
> THE WITNESS: We'd ordered the appraisal, and I did not recommend that we -
>
> THE COURT: Not my question. You thought it was okay to approve an NAV that you believed overstated the value . . . -- well, did you believe that it was okay to do that?

THE WITNESS: I believed that it was okay to approve an NAV that was -- that was consistent with the procedures we had been following.

THE COURT: Although you in fact believed it to overstate what the actual value of the assets was?

THE WITNESS: I believed that the board acting together agreed that that would be an appropriate NAV and that we --

\* \* \*

THE COURT: You're . . . say[ing] that you believed it to be overstated but approved it nonetheless. That's a fair characterization of your testimony; right?

THE WITNESS: I said we thought that cap rates were rising and the trend in values were down, but I approved the 42.11.

THE COURT: Well, did you approve it, believing it to be overstated? Yes or no?

THE WITNESS: I thought it was consistent with the procedures that we had established.

THE COURT: Not my question. Not my question. Did you believe that the NAV you voted for overstated the value of the assets? Yes or no?

THE WITNESS: I'm very reluctant to say that.

(Tr. 481:21-484:15.)

Gifford further equivocated when asked about the importance of accurately stating

NAV for purposes other than the Put Agreement, such as calculating employee redemptions and taxes, stating that the Board stuck to a procedure that "tried to reflect the value" of DSRG, but that he did not believe the Board had an obligation to conduct a "more robust analysis." (Tr. 451:13-24.) While Gifford's equivocal testimony certainly undermines the credibility of his statement that he believed the NAV was overstated at the time of the board meeting, Gifford's testimony also illustrates the broader point that, because of the difficulties inherent in ascertaining cap rates and other property-specific data, the practical reality is that there was a range of NAV calculations that could "reflect" DSRG's actual value. Indeed, Gifford conceded as much in his trial testimony:

THE COURT: Mr. Taylor . . . acknowledged that this is as much or more art than science. Would you agree with that?

THE WITNESS: As you can see by these proceedings, it's hard to pin down. That's for sure.

(Tr. 451:25-452:6.)

Finally, Defendant argues that Plaintiff's exercise of the put provided Plaintiff with a "windfall" that was contrary to the "spirit" of the parties' agreement. (Def.'s Mem. at 37.) According to Defendant's witnesses, the purpose of the agreement was to provide Plaintiff – a minority shareholder – with "protection" so that it could cash out of its investment in the event that it disagreed with the direction taken by the Company or thought that it had been treated unfairly. (Tr. 442:4-10.) Defendant's witnesses further testified that there was an understanding that, in the event that Plaintiff elected to exercise the put option, a full appraisal of DSRG would be undertaken, as

"[t]he only way to get fair market value was to have the portfolio appraised." (Tr. 444:20-22.) While there is no doubt that Plaintiff, aware of declining values throughout the economy, realized that the value of the put would be maximized if exercised prior to the 2008 year-end appraisal, there is nothing in the language of the agreement or in the evidence presented at trial to suggest that such an exercise was improper or undertaken in bad faith.

Ultimately, Defendant's position boils down to an assertion that the Board could have done a better and more carefully-calibrated analysis of the NAV in November 2008, and that they might have done so had they realized on November 12 that Plaintiffs would choose to exercise the put option. But the Board's decision not to adjust for changes in cap rates and NOI, despite their ability to do so, coupled with the stipulation that the Board acted in good faith and in conformity with their fiduciary duties, supports a conclusion that the September 30, 2008 NAV, though by no means pinpointed – or in fact even knowable as a Platonic truth – adequately reflected the value of the company. The Put Agreement does not require a full appraisal upon the exercise of the option. To the contrary, the document directs the parties to look *back* to the most recent NAV reported by the Board to the Company's stockholders, and speaks broadly and unscientifically of a methodology that "reflect[s] the actual value" of the company. The parties did not negotiate for more, even though they clearly could have. The fact that Defendant subsequently devised what it considers to be a better, more precisely-calibrated valuation methodology is beside the point. To hold otherwise would give Defendants more than they bargained for when they negotiated the Put Agreement. As such, the Court has little difficulty concluding that the so-called "spirit" of the agreement asserted by

Defendant has no basis in the actual *language* of the agreement.

Accordingly, based on the evidence introduced at trial, the Court finds that the valuation methodology employed by the Board in connection with the Company's third quarter NAV did in fact "reflect the actual value of the Company" as contemplated by the Put Agreement.

### B. Prejudgment Interest

Plaintiff also seeks prejudgment interest at the rate of ten percent per annum pursuant to sections 3287(a) and 3289(b) of the California Civil Code.[5] Plaintiff argues that it is entitled to interest as of June 19, 2009, the date of the "failed closing." (Pl.'s Mem. at 7.)

Section 3287(a) of the California Civil Code provides that:

> Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt.

California Civil Code § 3287(a). "In an action at law based on a contractual obligation, if the requirements of Civil Code, section 3287 are met, the plaintiff is entitled to an award of interest as a matter of right." *Rabinowitch v. Cal. W. Gas Co.*, 257 Cal. App. 2d 150, 160 (Ct. App. 1967). However, "[w]here the person liable does

---

[5] The parties agree that California law applies to the issue of whether Plaintiff is entitled to prejudgment interest. (*See* Pl.'s Post-Trial Mem. at 7-8; Def.'s Post-Trial Reply at 10-13.)

not know what sum he owes and where damages can be arrived at only by judicial determination on conflicting evidence, the damages are uncertain and there is no basis for the award of prejudgment interest." *Block v. Laboratory Procedures, Inc.*, 8 Cal. App. 3d 1042, 1046-47 (Cal. Ct. App. 1970); *cf. Conderback, Inc. v. Standard Oil Co. of California Western Operations, Inc.*, 239 Cal. App. 2d 664, 689-91 (Ct. App. 1966) ("Where a defendant does not know what amount he owes and cannot ascertain it except by accord or judicial process, he cannot be in default for not paying it.").

Here, the Court finds that the amount of Plaintiff's damages is sufficiently certain to warrant an award of pre-judgment interest. While Defendant argues that damages were not certain because "the price of the Put ha[d] to be determined based on conflicting evidence" (Def.'s Post-Trial Reply at 11), California courts have found that an award of prejudgment interest is not precluded merely because of a "bona fide dispute between the parties as to the amount owing under an express contract," *Block*, 8 Cal. App. 3d at 1046. The Put Agreement plainly states that calculation of the NAV is to be done pursuant to "the valuation methodology employed by the Company's Board of Directors." (PX-1 § 1.2.) The Board followed this procedure here and, as such, the amount of damages sought by Plaintiff has been clear from the outset of this litigation. The fact that Defendant later rejected Plaintiff's damages calculation in favor of a different, smaller number does not mean that Plaintiff's damages were uncertain or unvested under California law. Indeed, Defendant's argument would be persuasive only if this case had proceeded to the second phase of trial, in which the Court would have been required to make its own determination of the Company's NAV as of September 30, 2008. However, given that the Court has concluded that the

methodology employed by the Board *was* in fact reflective of the Company's actual value as of September 30, 2008, the damages sought by Plaintiff have been readily ascertainable all along based on the reported NAV of $42.11 per share.

Accordingly, the Court finds that Plaintiff is entitled to prejudgment interest under California law from June 19, 2009.

IV. CONCLUSION

For the reasons set forth above, the Court finds that the methodology used by the Board to calculate the September 30, 2008 NAV sufficiently reflected DSRG's actual value to satisfy the terms of the parties' Put Agreement. The Clerk of the Court is respectfully directed to enter judgment for Plaintiff in the amount of $18,529,203.49, plus pre-judgment interest at the rate of 10% from June 19, 2009, and to close this case.

SO ORDERED.

Dated: February 3, 2012
New York, New York

RICHARD J. SULLIVAN
United States District Judge

***

Plaintiff is represented by John G. McCarthy and Steven E. Brust of Smith, Gabrell & Russell, LLP, 250 Park Avenue, Suite 1900, New York, New York, 10177.

Defendant is represented by James L. Bernard and David Cheifetz of Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038.